UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10285-GAO

GENE THROWER and ABANTE ROOTER AND PLUMBING, INC.,
individually and on behalf of all others similarly situated,
Plaintiffs,

v.

CITIZENS DISABILITY, LLC,
Defendant.

OPINION AND ORDER
August 30, 2022

O'TOOLE, D.J.

The plaintiffs Gene Thrower and Abante Rooter and Plumbing, Inc. have brought this putative class action alleging that the defendant Citizens Disability, LLC ("Citizens") employed marketing practices targeted at them that violate the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq. In brief, the plaintiffs claim that the defendant unlawfully placed calls and sent text messages to their cell phones without having received express consent to do so. The plaintiffs have moved to certify their proposed class under Federal Rule of Civil Procedure 23. For the reasons detailed below, and after a hearing on the merits, the motion is granted.

**I.      Background**

Citizens assists disabled persons with applying for Social Security Disability Insurance ("SSDI") benefits in exchange for a percentage of the benefits they are ultimately awarded. Citizens markets itself to potential customers directly by contacting them via telephone, text message, or email. To identify potential customers, Citizens works with marketing partners—referred to as "lead generators"—that operate websites frequented by individuals who may qualify

for SSDI benefits. These websites often promise access to online shopping discounts or other benefits to induce potential SSDI applicants to fill out consent forms. After an individual fills out a form on a lead generator website, the lead generator sells the individual's contact information to Citizens. Citizens then uses that information to contact the individual to sell its services. The identities of potential customers and their contact information are referred to as "leads."

The TCPA prohibits companies from placing "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii). The plaintiffs commenced this action under the TCPA, alleging that Citizens sent text messages and placed calls to them and others on their cell phones using an ATDS without first obtaining express consent. Citizens denies those allegations and argues that all individuals who received marketing calls had expressly consented to receive such calls by filling out consent forms on lead generator websites. Citizens also denies using an ATDS. The plaintiffs moved to certify the following class:

> All persons in the United States who (1) received a text message call or telephone call by or on behalf of Defendant, (2) on his, her, or its cellular telephone, (3) from the last four years through the date notice is sent to the Class, (4) for the same purpose as Defendant (or its agent) placed the text message or telephone call to Plaintiffs, (5) using the same equipment that was used to call or text the Plaintiffs, and (6) for who Defendant claims it obtained express consent to place the text message or telephone call in the same manner that Defendant contends it obtained express consent to call or text Plaintiffs.

(Pls.' Mot. for Class Certification at 3 (dkt. no. 29).)

## II. Legal Standard

In seeking class certification, a plaintiff must demonstrate that: 1) there are so many putative class members that joinder of all members is impracticable; 2) common questions of law or fact exist within the class; 3) the named plaintiff's claims or defenses are typical of those of the

class; and 4) the named plaintiff will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a). A putative class action plaintiff must also satisfy at least one of three sub-parts of Rule 23(b). Id. 23(b). Rule 23(b)(3)—which is relied upon here—authorizes certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id. 23(b)(3). A court applying Rule 23(b)(3) must consider individual class members' possible interests in separate actions, the effect of any pre-existing litigation, the suitability of the forum, and any expected difficulties in managing the class action. Id. A putative class action plaintiff "must affirmatively demonstrate his compliance" with Rule 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

**III.**  **Discussion**

The plaintiffs must demonstrate that the proposed class is ascertainable and that it satisfies both Rules 23(a) and 23(b)(3). They have done so.

    A.  Ascertainability

Rule 23 implicitly requires that a proposed class be "ascertainable," and that identifying members be "administratively feasible." Shanley v. Cadle, 277 F.R.D. 63, 67–68 (D. Mass. 2011). A class is ascertainable if members can be identified through "stable and objective factors" without individualized litigation as to each member. Id. at 67; Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 9 (D. Mass. 2010) (finding a class ascertainable where members were smokers who were not being treated for lung cancer); see also Hilao v. Estate of Marcos, 103 F.3d 767, 774 (9th Cir. 1996) (finding a class ascertainable where members were citizens of the Philippines who were tortured by paramilitary groups between 1972 and 1986). A class is unascertainable if membership hinges on "a legal determination requiring detailed inquiry into the particulars of each potential

3

claimant's circumstance" rather than "an objective fact[.]" Shanley, 277 F.R.D. at 68 (finding a class unascertainable where membership hinged on whether the defendant attempted to collect a debt from an individual at a time when the defendant lacked a license to collect the type of debt owed) (citation omitted).

The proposed class here is said to consist of persons who: 1) received marketing calls or messages from the defendant within the last four years; 2) were called using the same communications equipment that the defendant used to call the named plaintiffs; and 3) were contacted based on leads from the same lead generators that produced leads for the named plaintiffs. Citizens argues that the class is unascertainable as to the third criterion, claiming that its own records regarding lead acquisition are too sparse to identify the specific lead generator that generated a lead for a given customer. This argument must fail on its face; a TCPA defendant's failure to maintain adequate records is not a legitimate basis for denying certification. Birchmeier v. Caribbean Cruise Line, Inc., 302 F.R.D. 240, 250 (N.D. Ill. 2014) (declining to deny certification based on insufficiency of defendants' records because "defendants are essentially arguing that the contours of the class should be defined by defendants' own recordkeeping"). Indeed, "declining to certify a class altogether, as defendants propose . . . would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct." Id.

In any event, the record before this Court at this stage indicates that Citizens' records are sufficiently detailed to identify class members. Each customer listed in those records is assigned a "vendor lead code"—a unique identifier that corresponds to the lead generator responsible for that lead. Those codes, Citizens admits, can be used to determine whether the lead for a given customer

came from the same lead generators as the leads related to Thrower and Abante. The proposed class is ascertainable.

B.     Rule 23(a) Certification Requirements

Next, the proposed class must satisfy the four requirements imposed by Rule 23(a). It clearly does so. "The plaintiff need not pinpoint the exact number of class members [to demonstrate numerosity], so long as she can demonstrate the impracticality of joinder." Donovan, 268 F.R.D. at 10. The numerosity inquiry should be guided by "common sense," particularly when concrete evidence is lacking. See id. ("[C]ommon sense suggests that the number of smokers age fifty and above who are not under care for lung cancer would be in the thousands. . . . Joinder is clearly impractical."). Here, given the nature of the nationwide marketing strategy alleged, common sense suggests that there may be thousands of class members.

The commonality requirement is also satisfied. Commonality hinges not on "the raising of common 'questions'" but on "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." Wal-Mart, 564 U.S. at 350 (emphasis in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). That said, "[c]ommonality is a low hurdle"— "[a] single factual issue can suffice." Donovan, 268 F.R.D. at 10 (citation omitted). The plaintiffs' allegations raise multiple common issues, including whether the forms filled out by customers on lead generator websites conveyed consent to be contacted, and whether Citizens called customers using an ATDS.

The existence of those same common issues also helps establish typicality. Indeed, typicality and commonality "tend to merge" because they both focus on whether the plaintiffs' claims are sufficiently "interrelated" with those of the class. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982). The plaintiffs have met their burden as to both commonality and

typicality by alleging that they received the same types of calls as other class members, and that they were unlawfully harmed in the same way. See In re Bos. Sci. Corp. Sec. Litig., 604 F. Supp. 2d 275, 282 (D. Mass. 2009) ("The plaintiff can [establish typicality] by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class.").

To demonstrate adequate representation, a plaintiff must show that "the interests of the representative party will not conflict with the interests of any of the class members" and that plaintiff's counsel is "qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). Here, the named plaintiffs' interest in avoiding unlawful marketing appears directly aligned with similar interests of members of the proposed class. There is also no suggestion that the named plaintiffs' attorney is incapable of effectively representing the class in this litigation.

### C. Rule 23(b)(3) Certification Requirements

With ascertainability established and Rule 23(a) satisfied, the certification inquiry turns to Rule 23(b)(3). Certification is appropriate under this rule if the plaintiff demonstrates the predominance of common issues over individual issues and the superiority of a class action as a method for fairly and efficiently adjudicating this controversy. Fed. R. Civ. P. 23(b)(3). Thrower and Abante have cleared both of those hurdles.

#### i. Predominance

To establish predominance, a putative class action plaintiff must show that the proposed class is "sufficiently cohesive to warrant adjudication by representation," Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997), and that a "sufficient constellation of common issues binds class members together . . . ." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st

Cir. 2000); see also Donovan, 268 F.R.D. at 28 ("The heart of the predominance inquiry is whether the 'uncommon questions' outweigh the commonalities." (citation omitted)). While the predominance requirement is "far more demanding" than Rule 23(a)'s commonality requirement, it does not require that zero individual issues exist. Amchem, 521 U.S. at 624. Instead, the aim of the inquiry is to "test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018) (quoting Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013)). Inefficiency stems from the administrative burdens associated with deciding complex questions on a plaintiff-by-plaintiff basis, such as conducting individualized evidentiary hearings. In re Asacol, 907 F.3d at 51–52. Unfairness relates to the defendant's right to effectively contest the eligibility of potential class members. Id. Thus, "[i]n assessing efficiency and fairness . . . a class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of the defendants' Seventh Amendment and due process rights.'" Id. at 52 (quoting In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)).

  Here, liability as to each putative class member will hinge on: 1) whether the individual was called by Citizens within the statutory period; 2) whether the call was placed via the same system used to call the plaintiffs; 3) whether Citizens willfully placed the call; 4) whether Citizens placed the call to market its services; and 5) whether the individual had previously consented to receiving the call by filling out a form on a lead generator website. Common issues predominate because each of those five questions can be addressed either on a class-wide basis, or in an individualized manner that is neither inefficient nor unfair.

The first question—whether an individual was called by Citizens—can easily be answered using Citizens' internal data. Individualized factual determinations do not create inefficiency or unfairness if they can be made pursuant to rote, mechanical processes. Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.").

The second, third, and fourth questions—whether a given call was placed using an ATDS, whether Citizens willfully placed that call, and whether that call was intended to market Citizens' services—are all capable of class-wide adjudication. Citizens has repeatedly stated that all calls were made through the same automated system (which it claims was *not* an ATDS), pursuant to the same processes, and for the same commercial reasons.

The final question—whether an individual gave express consent to be contacted by Citizens—has two aspects. First, there is a threshold factual issue: whether the individual filled out a form on a lead generator website. This step requires individualized factual determinations, but Citizens admits that those determinations can be made through a simple analysis of its own internal data. Individualized customer-by-customer evidentiary hearings will not be necessary. As a result, those individualized inquiries do not create inefficiency or unfairness, and they do not preclude certification. See Smilow, 323 F.3d at 40.

The second step of the consent inquiry, necessary only as to individuals who filled out forms on lead generator websites, presents a legal issue: whether the forms themselves conveyed consent to be contacted for the purposes of the TCPA. This issue can be adjudicated on a class-wide basis. Citizens does not claim that the wording of these forms varies between lead generator websites or between users of the same website. Indeed, given that lead generators each operate

multiple websites, the number of unique forms requiring analysis will likely mirror the number of lead generators.[1] A few determinations of whether the wording of a given form conveyed express consent to be contacted will likely suffice to cover the proposed class.

Citizens argues that the denial of certification in Bais Yaakov of Spring Valley v. ACT, Inc., 12 F.4th 81 (1st Cir. 2021) compels denial here. Bais Yaakov concerned unwanted marketing faxes sent by a standardized testing company to various schools. 12 F.4th at 83–84. Liability under the TCPA turned on whether the plaintiff schools had given the testing company "express permission" to send the faxes by previously requesting other materials. Id. at 88–89. As here, the consent inquiry for class membership had a factual aspect (whether a school requested materials from the company) and a legal aspect (whether the request gave express permission to send the faxes complained of). The court denied certification because both issues required individualized determinations. Id. at 89. Because each school wrote its own request for materials, the legal issue could not be dealt with on a class-wide basis; the court would have had to inquire separately into each school's communications with the testing company to determine whether they had consented to the faxes. Id. (noting that "to identify [consenting] members the court would have to 'parse through each unique relationship' between every class member and ACT").

Here, the story is different. The wording of requests for materials in Bais Yaakov varied from school to school, whereas all signs here point to general uniformity among consent forms on lead generator websites. The plaintiffs here did not produce the language that was later interpreted by the defendant as conveying consent to be contacted. They checked boxes to fill out pre-

---

[1] The parties agree that leads for Thrower and Abante were generated by two lead generators: DMS and Fluent. At this stage, then, it appears that the class will only include individuals contacted pursuant to leads from DMS and Fluent, and that the legal inquiry as to consent will only address the online forms found on websites operated by DMS and Fluent.

packaged forms that were provided to them on the websites they visited, which were presumably identical to the forms provided to all other users of those same websites. The legal aspect of the consent inquiry can be dealt with on a class-wide basis. The plaintiffs have demonstrated that common issues predominate.

      ii.     *Superiority*

The superiority (or inferiority) of a class action as a method for adjudicating a dispute hinges on individual class members' interests in separate actions, the effect of pre-existing litigation, the suitability of the forum, and any expected difficulties in case management. Fed. R. Civ. P. 23(b)(3). Generally, "[s]uperiority exists where 'there is a real question whether the putative class members could sensibly litigate on their own for these amounts of damages, especially with the prospect of expert testimony required.'" Donovan, 268 F.R.D. at 29 (quoting Gintis v. Bouchard Transp. Co., Inc., 596 F.3d 64, 68 (1st Cir. 2010)). Courts evaluating superiority must remain cognizant that "[t]he core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." Smilow, 323 F.3d at 41 (citing Amchem, 521 U.S. at 617).

Here, the superiority factors militate in favor of class certification. As is often the case in TCPA cases, class members will have little incentive to litigate their claims individually. Although their claims would depend on similar factual and legal issues, each claim would have limited monetary value, making the prospect of individual suits unlikely. See Donovan, 268 F.R.D. at 29. Indeed, the putative class members' interest in class certification is particularly strong because there is a "considerable disparity in resources" between them and the corporate defendant, and because they seek injunctive relief that "is not available for a simple sum of money." See id. Injunctive relief as to one plaintiff among thousands has little impact. Finally, and as discussed

above, the need to adjudicate individualized issues separately will be limited, and any individualized adjudications that become necessary will have minimal impact on efficiency and fairness. The plaintiffs have demonstrated superiority and carried their burden of compliance with Rule 23(b)(3). The merits of their claims shall be decided on a class-wide basis.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification (dkt. no. 29) is GRANTED. The following class is hereby certified, subject to amendment:

> All persons or entities in the United States who: 1) received a text message or telephone call from or on behalf of the defendant Citizens Disability, LLC; 2) on their cellular telephone; 3) no earlier than February 12, 2016, and no later than the date notice is sent to the class; 4) for the same purpose for which the defendant (or its agent) contacted the named plaintiffs; 5) using the same equipment or automated system that was used to contact the named plaintiffs; and 6) pursuant to leads generated by the same marketing partners that generated leads as to the named plaintiffs.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge
